UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

HILARY BEST.

Plaintiff,

-against-

MYLES SCHNEIDER, ANKUR SARAIYA,
MICHAEL HOGAN, ANN MARIE BARBAROTTA,
MARIA LOURDES GONZALES, PHILIP NINAN, and
YEVGENIY KHALDAROV,

Defendants.

------------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**12-CV-6142 (NGG) (MDG)**

Pro se Plaintiff Hilary Best brings this action pursuant to 42 U.S.C. § 1983 seeking both

monetary and injunctive relief for the violation of his constitutional rights in connection with his

involuntary commitment at Creedmoor Psychiatric Center ("Creedmoor") in Queens, New York.

Defendants Myles Schneider and Ankur Saraiya (collectively, "City Defendants"), are

psychiatrists employed by Bellevue Hospital Center ("Bellevue"), and are represented by the

New York City Law Department. Defendants Ann Marie Barbarotta, Maria Lourdes Gonzales,

Philip Ninan, and Yevgeniy Khaldarov[1] (collectively, "State Defendants"), are employed by

Creedmoor, and are represented by the New York State Attorney General.[2] Both City and State

Defendants have moved to dismiss Plaintiff's Amended Complaint (Dkt. 6) in its entirety.

---

[1] The Clerk of Court is respectfully DIRECTED to amend the caption to reflect the proper spelling of this Defendant's last name, which is Khaldarov.

[2] At a September 6, 2013, hearing regarding Defendants' motion to dismiss, Plaintiff withdrew his claim against Defendant Michael Hogan as Commissioner of the New York State Department of Mental Health. (See Am. Compl. (Dkt. 6) at 4; Report and Recommendation ("R&R") (Dkt. 78) at 5 (citing Sept. 6, 2013, Hr'g Tr. (Dkt. 74) at 23, 26).) Consequently, Magistrate Judge Marilyn D. Go's recommendation that the court dismiss this claim without prejudice (see R&R at 31; Sept. 6, 2013, Hr'g Tr. at 26) was not clearly erroneous, and is hereby ADOPTED IN FULL.

1

Before the court is Magistrate Judge Marilyn D. Go's Report and Recommendation ("R&R"), dated September 10, 2014, recommending that City Defendants' motion be granted in full, and that State Defendants' motion be granted in part and denied in part. (R&R (Dkt. 78) at 31.) Both Plaintiff and State Defendants filed objections to the R&R. For the reasons that follow, State Defendant's objections are SUSTAINED IN PART and OVERRULED IN PART; Plaintiff's objections are OVERRULED. Accordingly, the R&R is ADOPTED IN PART and REJECTED IN PART.

## I.    BACKGROUND

### A.    Relevant Facts

The following facts are drawn from Judge Go's R&R, as well as (1) several documents that Plaintiff directly incorporated into his Amended Complaint, see Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (documents attached to a complaint or incorporated into it by reference are deemed part of the pleadings and may be considered in evaluating a Rule 12(b)(6) motion to dismiss)); and (2) public records, of which this court may take judicial notice, see Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir. 2006) (courts may take judicial notice of certain records to establish the fact of such filings but not for the truth of the matters asserted therein).

On August 21, 2011, Plaintiff was arrested and charged in New York Criminal Court, New York County, with harassment in the first degree, aggravated harassment in the second degree, and stalking in the fourth degree. (See Certificate of Disposition, People v. Best, No. 2011NY061966 (N.Y. Crim. Ct. Sept. 9, 2013) (State Defs.' Sept. 17, 2013, Ltr. ("Velez Ltr.") (Dkt. 70), Ex. B (Dkt. 70-2)) at 1.) According to State court records, Plaintiff had harassed a woman by calling her approximately nine times, despite her previous request that he not

contact her in any manner. (See Misdemeanor Compl., Best, No. 2011NY061966 (N.Y. Crim. Ct. Aug. 22, 2011) (Velez Ltr., Ex. B) at 1-2.) The State also alleged that although he had never shared a relationship with this woman, Plaintiff appeared at her mother's residence and confronted her mother, asking why she was hiding his wife and child from him. (Id. at 2.)

On August 1, 2012, New York State Supreme Court Justice Jennifer G. Schecter issued an order directing that Plaintiff be examined pursuant to New York Criminal Procedure Law ("CPL") section 730 to determine whether he was mentally incapacitated and therefore unfit to proceed with trial. (See Examination Report, Best, No. 2011NY061966 (N.Y. Crim. Ct.) (Am. Compl. app. (Dkt. 6-1)) at 1.) See also N.Y. Crim. Proc. Law § 730.30(1). Accordingly, Plaintiff was examined on August 9 and 22, 2012, by two psychiatrists—Defendant Dr. Myles Schneider and Defendant Dr. Ankur Saraiya—of the Forensic Psychiatry Clinic at Bellevue. (See generally Am. Compl. app. at 1-14.) Both Schneider and Saraiya diagnosed Plaintiff with Delusional Disorder and determined that as a result of this condition, Plaintiff lacked both the capacity to understand the proceedings against him and to assist in his own defense. (Id. at 2, 5, 7, 14.) Consequently, they concluded that Plaintiff was an "incapacitated person" within the meaning of section 730, and thus Plaintiff was unfit to proceed to trial. (Id.) See also N.Y. Crim. Proc. Law § 730.10(1) (defining "incapacitated person").

On September 7, 2012, New York State Supreme Court Justice Melissa Jackson issued an order (1) adjudicating Plaintiff an incapacitated person, (2) directing that Plaintiff remain detained for no more than 90 days at Bellevue, pending the designation of an appropriate facility by the Commissioner of Mental Health (the "Commissioner"), and (3) dismissing the misdemeanor complaint against Plaintiff. (Final Order for Observation and Dismissal of Accusatory Instrument ("Final Order"), Best, No. 2011NY061966 (N.Y. Crim. Ct. Sept. 7, 2012)

(Velez Ltr., Ex. C (Dkt. 70-3)) at 3; see also id. (noting no motion for hearing was made).) See N.Y. Crim. Proc. Law § 730.40(1) ("If [the court] is satisfied that the defendant is an incapacitated person . . . such court must issue a final or temporary order of observation committing him or her to the custody of the commissioner for care and treatment in an appropriate institution for a period not to exceed ninety days from the date of the order . . . ."). Plaintiff was not immediately transferred to a facility under the "care and custody" of the Commissioner (see id.), because he was at that time being held at Rikers Island Correctional Facility, in the custody of the City of New York, pursuant to unrelated misdemeanor charges pending against him in New York Criminal Court, Bronx County. (See R&R at 3 n.3 (citing Sept. 6, 2013, Hr'g Tr. at 13-14; Case Details, People v. Best, No. 2012BX049460 (N.Y. Crim. Ct.) (Velez Ltr., Ex. D (Dkt. 70-4)) at 2-3).) In connection with those charges, for which he was being held on $1 bail, Plaintiff made seven appearances in Bronx Criminal Court between September 6, 2012, and November 28, 2012. (See Case Details, Best, No. 2012BX049460 (N.Y. Crim. Ct.) at 2-3.)

On December 3, 2012, however, the Office of Mental Health ("OMH") Bureau of Institutional and Transitional Services, Division of Forensic Services, ultimately designated Creedmoor to receive Plaintiff for care and treatment pursuant to section 730. (R&R at 3; see also CPL Designation Notification (Velez Ltr., Ex. B) at 2 (reflecting that Plaintiff was being transferred from Rikers Island).) On December 4, 2012, Plaintiff was transferred from the custody of New York City to Creedmoor, an OMH-operated psychiatric hospital that provides inpatient and outpatient treatment for adults with mental illness. (See Am. Compl. at 6; State Defs.' Objections to R&R ("State Defs.' Obj.") (Dkt. 85) at 3; see also Ltr. of Incarceration (City Defs.' Oct. 1, 2013, Ltr. (Dkt. 72), Ex. A (Dkt. 72-1)).) On December 5, 2012, Defendant Ann

4

Marie Barbarotta, Creedmoor's Executive Director, executed an application for Plaintiff's involuntary admission to the hospital pursuant to New York Mental Hygiene Law section 9.27. (See Appl. for Involuntary Admission on Medical Certification (Am. Compl. app. at 16).) See N.Y. Mental Hyg. Law § 9.27(a) ("The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person."). On the application, Barbarotta wrote that Plaintiff, who was sent from Rikers Island pursuant to CPL section 730.40, presented with paranoid delusions—including the belief that his landlord's attorney was bribing the judge to have Plaintiff detained—and that Plaintiff had poor insight and refused medication. (Am. Compl. app. at 16.) Another Creedmoor psychiatrist, Defendant Dr. Yevgeniy Khaldarov, confirmed the need for Plaintiff's involuntary care and treatment in a hospital, indicating that he had examined Plaintiff prior to his involuntary admission, and determined that (a) Plaintiff was in need of involuntary care and treatment, and (b) as a result of his mental illness, Plaintiff posed a "substantial threat of harm" to himself or others. (Id.) Khaldarov signed the application at 9:40 a.m. on December 5, 2012.

In apparent compliance with section 9.27, Barbarotta's application was also supported by examining physician certificates completed on December 5, 2012, by two additional Creedmoor psychiatrists, Defendant Dr. Maria Lourdes Gonzales and Defendant Dr. Philip Ninan. (See id. at 17, 18.) According to the certificates, Gonzales examined Plaintiff at 10:30 a.m., and Ninan examined Plaintiff at 11:30 a.m. the same day. (Id.) Both physicians certified that Plaintiff was in need of involuntary care and treatment for his mental illness and that, as a result of this illness, Plaintiff posed a "substantial threat of harm" to himself or others. (Id.) In particular, Gonzales indicated that Plaintiff was paranoid, had "limited insight," and refused any treatment (id. at 17;

Ninan reported that Plaintiff presented with paranoid delusions of the "persecutory typ[e]," along with "poor insight" (id. at 18).

Plaintiff was subsequently provided notice of his conversion to involuntary status on December 5, 2012. (Id. at 15.) The notice form given to Plaintiff indicated that he could be kept at Creedmoor for a period of up to 60 days from the date of conversion. (Id.) He was also informed that if he believed he did not need involuntary care and treatment, he could make a written request for a court hearing. (Id.) See N.Y. Mental Hyg. Law § 9.31(a) ("If, at any time prior to the expiration of sixty days from the date of involuntary admission of a patient on an application supported by medical certification, he . . . gives notice in writing to the director of request for hearing on the question of need for involuntary care and treatment, a hearing shall be held as . . . provided [by the statute].").

Pursuant to section 9.31, Plaintiff requested a hearing, which was held on January 2, 2013, before Justice Martin J. Schulman of the New York State Supreme Court, Queens County.[3] (Jan. 2, 2013, Hr'g Tr. (Decl. of Jose L. Velez in Supp. of Mot. to Dismiss ("Velez Decl.") (Dkt. 55), Ex. B (Dkt. 60)) at 1.) At the hearing, the New York State Attorney General's Office, which represented Creedmoor, called Dr. Ella Brodsky, a Creedmoor psychiatrist, as an expert witness. Dr. Brodsky testified that having reviewed Plaintiff's record and discussed it with his treatment team, it was her opinion that Plaintiff was suffering from delusional disorder (id. at 4:20-5:6), and that continued care and treatment at Creedmoor was necessary, especially to evaluate Plaintiff for schizophrenia (id. at 6:6-25). Moreover, Dr. Brodsky testified that she concluded Plaintiff presented a danger to others in light of his history

---

[3] Plaintiff does not allege in his Amended Complaint whether he requested the hearing more than five days before it was conducted. Cf. N.Y. Mental Hyg. Law § 9.31(c) (requiring that hearing be held "not later than" five days from the date the court receives notice of the request for a hearing).

of multiple sexual crimes and his delusional disorder, which raised the concern about his inability to control his impulses. (Id. at 12:7-14.) At the conclusion of the hearing, during which Plaintiff appeared pro se, Justice Schulman granted Creedmoor's application for involuntary admission and denied Plaintiff's request for relief. (Id. at 39:21-22.)

On January 10, 2013, Plaintiff moved for a rehearing and review of Justice Schulman's decision under section 9.35. (See Order to Show Cause, Best v. Creedmoor Psychiatric Center, No. 501505/2012 (N.Y. Sup. Ct. Jan. 17, 2013) (Velez Decl., Ex. C (Dkt. 55-1)) at 1.) See N.Y. Mental Hyg. Law § 9.35 ("If a person . . . whose retention . . . has been authorized pursuant to this article . . . be dissatisfied with any such order he may . . . obtain a rehearing and a review of the proceedings already had and of such order upon a petition to a justice of the supreme court other than the . . . justice presiding over the court making such order."). On February 11, 2013, New York State Supreme Court Justice Duane A. Hart denied the motion as moot, because the 60-day period of Plaintiff's involuntary admission under section 9.31 had expired five days earlier. (See Order, Best, No. 501505/2012 (N.Y. Sup. Ct. Feb. 11, 2013) (Velez Decl., Ex. D (Dkt. 55-1)) at 2.)

However, on January 16, 2013, while Plaintiff's section 9.35 motion was pending, Creedmoor filed an application pursuant to section 9.33 for court authorization to further retain Plaintiff. (Appl. for Court Authorization to Retain a Patient (Velez Decl., Ex. E (Dkt. 61) (filed under seal)) at 2.) On February 12, 2013, Justice Schulman conducted a hearing on Creedmoor's application. (See Feb. 12, 2013, Hr'g Tr. (Velez Decl., Ex. F (Dkt. 61) (filed under seal)) at 1.) Once again, the State called Dr. Brodsky as an expert witness, who reiterated the observations of Creedmoor physicians that Plaintiff continued to demonstrate extreme paranoia and to refuse treatment, and that Plaintiff was collecting personal information about one of the psychiatrists,

7

all of which led to their conclusions that he was "potentially dangerous." (Id. at 12:15-16:2.) At the conclusion of the hearing, at which Plaintiff again appeared pro se, Justice Schulman granted Creedmoor's application (id. at 38:16), authorizing the State to retain Plaintiff for a period not to exceed six months (Order, In re Best, No. 500120/2013 (N.Y. Sup. Ct. Feb. 13, 2013) (Velez Decl., Ex. G (Dkt. 55-1)).).

On February 19, 2013, Plaintiff filed a request for a de novo hearing and review by a jury pursuant to section 9.35. (Order to Show Cause, Best, No. 501505/2012 (N.Y. Sup. Ct. Feb. 27, 2013) (Velez Decl., Ex. H (Dkt. 55-1)).) See N.Y. Mental Hyg. Law § 9.35 (providing that the court "shall cause a jury to be summoned and shall try the question of the mental illness and the need for retention of the patient so authorized to be retained"). Following a nine-day jury trial (Reply in Supp. of Mot. to Dismiss (Dkt. 59) at 7) and a verdict in his favor, Plaintiff was ordered to be released from Creedmoor on March 21, 2013 (Pl.'s Apr. 19, 2013, Ltr. (Dkt. 42)).

**B.    Procedural History**

Plaintiff initiated the present action by filing the Complaint on December 11, 2012—just seven days after his conversion to involuntary admission at Creedmoor, and before the State court had conducted its first section 9.31 hearing regarding his detention.[4] (Compl. (Dkt. 1).) On January 4, 2013—two days after Justice Schulman ordered his continued detention—Plaintiff filed an Amended Complaint against City and State Defendants, as well as Justice Schecter and New York County Assistant District Attorney Kevin Rooney, alleging the violation of his rights under the Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the Federal

---

[4] One week later, Plaintiff also filed a petition for writ of habeas corpus in connection with his detention at Creedmoor. See Pet., Best v. Barbarotta, No. 12-CV-6218 (NGG) (E.D.N.Y. Dec. 18, 2012), ECF No. 1. His Petition remains pending before this court.

Constitution. (Am. Compl. at 2-3, 4.) In his Amended Complaint, Plaintiff requests: (a) a declaratory judgment finding section 730.30(3) unconstitutional as applied; (b) a permanent injunction against enforcement of section 730.40(1); and (c) monetary damages. (Id. at 10-11.)

Also on January 4, 2013, Plaintiff filed an emergency application for a temporary restraining order ("TRO") enjoining his continued detention at Creedmoor. (Emergency Mot. for TRO (Dkt. 7).) On January 10, 2013, the court denied Plaintiff's motion for an emergency TRO.[5] (Jan. 10, 2013, Order (Dkt. 8).) The same day, the court, sua sponte, dismissed with prejudice Plaintiff's claims against Justice Schecter and ADA Rooney as a result of their absolute immunity from suit. (Jan. 10, 2013, Mem. & Order (Dkt. 9) at 4-5.)

On January 29, 2013, Plaintiff filed a motion to amend his Amended Complaint, along with a Proposed Second Amended Complaint ("SAC"). (Mot. to Amend Civil Compl. (Dkt. 16); Proposed SAC (Dkt. 17).) On February 1, 2013, Plaintiff filed a motion to further amend his Amended Complaint, to which he attached a Proposed Third Amended Complaint. (Am. Mot. to Amend Compl. (Dkts. 18, 18-2).) On February 11, 2013, the court referred these motions to Judge Go for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (Feb. 11, 2013, Order (Dkt. 29).) Plaintiff subsequently contacted Judge Go's chambers, however, and conveyed his intent to file another motion for leave to further amend his Amended Complaint, which would supersede his pending motions for leave to amend. (See Mar. 8, 2013, Order.)

---

[5] Plaintiff filed an emergency motion for reconsideration of that denial (Dkt. 14), which the court also denied (Feb. 11, 2013, Order (Dkt. 23)). Subsequently, Plaintiff filed another motion for reconsideration of that denial (see Pl.'s Feb. 15, 2013, Ltr. (Dkt. 27)), which the court denied as well (Feb. 22, 2013, Order (Dkt. 32)). By letter dated March 11, 2013 (Dkt. 38), Plaintiff further contested the court's denial of his emergency TRO application, and requested an immediate hearing, which the court denied (Mar. 12, 2013, Order (Dkt. 39).)

On February 22, 2013, the court granted State and City Defendants leave to file a motion to dismiss Plaintiff's Amended Complaint (Feb. 22, 2013, Order (Dkt. 31)), which at that time was—and still remains—the operative complaint. State Defendants served their motion on March 20, 2013 (State Defs.' Mot. to Dismiss (Dkt. 52)); City Defendants served their motion on April 12, 2013 (City Defs.' Mot. to Dismiss (Dkt. 62)). On April 24 (Dkt. 43), May 2 (Dkt. 45), and May 7, 2013 (Dkt. 47), the court granted Plaintiff's requests for extensions of time to respond to Defendants' motions. On May 13, 2013, however, Plaintiff filed yet another motion to further amend his Amended Complaint (Dkt. 50), alongside a fourth request for an extension of time to respond to Defendants' motions (Dkt. 49). State Defendants opposed this request, arguing that Plaintiff had never represented to the court that the purpose of his prior requests for extensions of time was to enable him to complete a motion for leave to file a second amended complaint. (See State Defs.' May 14, 2013, Ltr. (Dkt. 48).)

In an Order dated May 21, 2013, the court construed Plaintiff's May 13, 2013, motion to amend as a request for a pre-motion conference in anticipation of filing a motion to amend. (See May 21, 2013, Order (Dkt. 51) at 1-2 (citing Individual Rule of Judge Nicholas G. Garaufis III.A.2).) Accordingly, the court referred Plaintiff's request for a pre-motion conference to Judge Go for decision; in the event Judge Go granted Plaintiff leave to file his motion to amend, the court referred the motion to Judge Go for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (Id. at 2.) In addition, the court referred Plaintiff's request for an extension of time to respond to State Defendants' motion to dismiss to Judge Go for decision. (Id.) Finally, the court ordered that if State Defendants' motion to dismiss was "necessary given Plaintiff's anticipated motion to

10

amend," that motion was thereby referred to Judge Go for a report and recommendation pursuant to § 636(b)(1)(B) and Rule 72(b)(1). (Id.)

Judge Go granted Plaintiff's request for an extension of time to respond to State Defendants' motion (May 28, 2013, Order); State Defendants ultimately filed their fully briefed motion to dismiss on June 10, 2013 (Dkts. 52-61). City Defendants filed their fully briefed motion to dismiss on June 13, 2013. (Dkts. 62-64.) On September 6, 2013, Judge Go conducted a hearing regarding the pending motions to dismiss and Plaintiff's motion to amend the Amended Complaint. At that hearing, Judge Go deemed Plaintiff's request for a pre-motion conference granted and converted his request for leave to file into a fully briefed motion to amend. (See Sept. 6, 2013, Hr'g Tr. at 10:20-23.) Judge Go also directed City and State Defendants to produce certain public records regarding Plaintiff's transfer from Rikers Island to Creedmoor, and invited the parties to file supplemental briefing on the motions after these documents had been produced. (See Sept. 6, 2013, Min. Entry.) On September 17, 2013, State Defendants provided additional public records to Judge Go (see Velez Ltr.); City Defendants submitted further documentation on September 27 (City Defs.' Sept. 27, 2013 Ltr. (Dkt. 71)), and October 1, 2013 (City Defs.' Oct. 1, 2013 Ltr. (Dkt. 72)). On October 2, 2013, State Defendants filed a supplemental brief (see Reply in Supp. of Mot. to Dismiss (Dkt. 73)); on October 24, 2013, Plaintiff filed a letter supplementing his arguments as well (see Mot. for Extension of Time to File Reply (Dkt. 76)).

## C.     Judge Go's R&R and Parties' Objections

On September 10, 2014, Judge Go issued an R&R recommending that the court grant City Defendants' motion to dismiss and grant in part State Defendants' motion to dismiss. (R&R at 31.) In particular, Judge Go recommended dismissing all claims against City Defendants in

11

their personal capacities on grounds of absolute judicial immunity, and all claims against City Defendants in their official capacities under <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 692-94 (1978). (<u>Id.</u> at 13, 14.) Judge Go also recommended dismissing all claims against State Defendants in their official capacities pursuant to their sovereign immunity under the Eleventh Amendment. (<u>Id.</u> at 14.) With respect to claims against State Defendants in their personal capacities, Judge Go recommended that the court dismiss Plaintiff's Fifth, Sixth, Eighth, and Thirteenth Amendment claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (<u>Id.</u> at 26-28.) For the same reason, Judge Go also recommended that the court dismiss Plaintiff's claim against State Defendants in their personal capacities under the Equal Protection Clause of the Fourteenth Amendment. (<u>Id.</u> at 26.)

By contrast, Judge Go recommended that the court hold that Plaintiff had sufficiently pleaded claims against State Defendants in their personal capacities under the Fourth Amendment (<u>id.</u> at 25), and the Due Process Clause of the Fourteenth Amendment (<u>id.</u> at 22). In particular, Judge Go recommended finding that Plaintiff had plausibly stated a procedural due process claim with respect to his involuntary admission to Creedmoor based on State Defendants' failure to: (1) comply with the certification procedures of Article 9 of New York's Mental Hygiene Law, and (2) provide Plaintiff with a predeprivation hearing (<u>e.g., id.</u>); and that Plaintiff had plausibly stated a substantive due process claim based on the failure of State Defendants to establish Plaintiff's dangerousness in the application for his involuntary admission (<u>see id.</u> at 19-21). Furthermore, Judge Go recommended that the court find that State Defendants had not adequately established a defense of qualified immunity because (1) Plaintiff's Amended Complaint sufficiently alleged Fourth and Fourteenth Amendment violations, and (2) State

Defendants did not argue that Plaintiff's constitutional rights were not clearly established. (Id. at 29.)

Finally, Judge Go advised the parties that Plaintiff's motion to amend his Amended Complaint would be addressed in a separate order. (R&R at 2 n.2.)

Having received extensions of time from this court to do so (see Sept. 19, 2014, Order (Dkt. 80); Oct. 6, 2014, Order (Dkt. 83)), both Plaintiff and State Defendants timely objected to Judge Go's R&R. Plaintiff filed written objections on October 15, 2014 (Pl.'s Written Objections ("Pl.'s Obj.") (Dkt. 84)); State Defendants responded to Plaintiff's objections on October 29, 2014 (State Defs.' Resp. to Pl.'s Obj. ("State Defs.' Resp.") (Dkt. 86)); City Defendants responded to Plaintiff's objections on October 30, 2014 (Decl. of David A. Rosinus, Jr. in Resp. to Pl.'s Obj. ("Rosinus Decl.") (Dkt. 88)); and Plaintiff filed a reply to City Defendants' response on January 8, 2015 (Aff. of Hilary Best in Reply to City Defs.' Decl. ("Best Reply") (Dkt. 93)).

Separately, on October 29, 2014, State Defendants filed written objections to Judge Go's R&R. (Obj. to R&R ("State Defs.' Obj.") (Dkt. 85).) Having been granted an extension of time to do so (see Nov. 17, 2014, Order (Dkt. 91)), Plaintiff timely filed a response on January 8, 2015 (Aff. of Hilary Best in Reply to State Defs.' Obj. ("Best Resp.") (Dkt. 92)).

Lastly, that same day, Plaintiff also filed an amendment to his original written objections. (Aff. of Hilary Best in Amendment to Pl.'s Obj. ("Pl.'s Am. Obj.") (Dkt. 94).)

## II.    STANDARD OF REVIEW

### A.    Review of R&R

When a district court receives timely objections to an R&R, the court makes "a de novo determination of those portions of the report or specified proposed findings or recommendations

to which objection is made. [The court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). In order to obtain de novo review, however, an objecting party "must point out the specific portions of the report and recommendation to which [that party] object[s]." Libbey v. Vill. of Atl. Beach, 982 F. Supp. 2d 185, 199 (E.D.N.Y. 2013); see also Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [R&R]." (emphasis added)). Thus, "an objection to a report and recommendation in its entirety does not constitute a specific written objection within the meaning of Rule 72(b)." Williams v. Woodhull Med. & Mental Health Ctr., 891 F. Supp. 2d 301, 310 (E.D.N.Y. 2012).

Moreover, "[w]here objections consist of 'conclusory or general arguments, or simply reiterate the original arguments,' or are merely an 'attempt to engage the district court in rehashing of the same arguments set forth in the original petition,' the Court reviews [an R&R] for clear error." Jemine v. Dennis, 901 F. Supp. 2d 365, 371 (E.D.N.Y. 2012) (quoting DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009)); see also Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002) (holding that "[m]erely referring the court to previously filed papers or arguments does not constitute an adequate objection" under Rule 72(b)). In addition, "[p]ortions of the R&R to which a party makes no objection are reviewed for clear error." Bouzzi v. F & J Pine Rest., LLC, 841 F. Supp. 2d 635, 638 (E.D.N.Y. 2012). "A decision is 'clearly erroneous' when the Court is, 'upon review of the entire record, left with the definite and firm conviction that a mistake has been committed.'" DiPilato, 662 F. Supp. 2d at 339-40 (quoting United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006)).

Furthermore, even under de novo review of a party's specific objections, courts "ordinarily will not consider 'arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the magistrate judge in the first instance.'" Libbey, 982 F. Supp. 2d at 199 (quoting Kennedy v. Adamo, No. 02-CV-1776 (ENV) (RML), 2006 WL 3704784, at *1 (E.D.N.Y. Sept. 1, 2006) (alteration in original)).

## B. Motion to Dismiss

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. See Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a 'probability requirement,'" but requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[M]ere 'labels and conclusions' or 'formulaic recitation[s] of the elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original) (quoting Twombly, 550 U.S. at 555). A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). While the Federal Rules of Civil Procedure do not require "detailed factual allegations," they do demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

In reviewing a complaint, the court must accept as true all allegations of fact, and draw all reasonable inferences from these allegations in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); see also Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 124 (2d Cir. 2010) (court must assume "all well-pleaded, nonconclusory factual allegations in the complaint to be true" (citing Iqbal, 556 U.S. at 678-79 (2009))), aff'd, 133 S. Ct. 1659 (2013). Moreover, courts are obligated to construe pro se complaints liberally, Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008), particularly when they allege civil rights violations, McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004). As the Supreme Court has previously indicated, "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). Accordingly, pro se complaints are interpreted as raising "'the strongest arguments that they suggest.'" Harris v. City of N.Y., 607 F.3d 18, 24 (2d Cir. 2010) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)). Nonetheless, pro se litigants are expected to comply with the procedural rules governing civil litigation. See LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir. 1995).

## III. DISCUSSION

Both Plaintiff and State Defendants have filed objections to Judge Go's R&R. The court first takes up State Defendants' objections before turning to Plaintiff's.

### A. State Defendants' Objections

State Defendants object to Judge Go's recommendations concerning Plaintiff's procedural and substantive due process claims under the Fourteenth Amendment, Plaintiff's

Fourth Amendment claim, their entitlement to qualified immunity, and the liability of Defendant Barbarotta in particular. The court addresses each in turn.

1.     Procedural Due Process

State Defendants' objections to Judge Go's recommendations with respect to Plaintiff's procedural due process claims are specific, and thus entitled to de novo review.

*a.     Physician Certifications*

The court first considers State Defendants' objection regarding Plaintiff's procedural due process claim based on what he alleges were fraudulent certifications signed by Defendants Gonzales and Ninan on December 5, 2012. As Judge Go explained, Plaintiff alleges that the certifications were fraudulent because both physicians based their opinions on the section 730 reports dated August 22, 2012, instead of examining Plaintiff themselves, as required by the Mental Hygiene Law. (R&R at 22 (citing Am. Compl. at 7).) See N.Y. Mental Hyg. Law § 9.27(a) (requiring certifications from "two examining physicians" (emphasis added)). Consequently, Judge Go recommended that the court find that Plaintiff stated a claim for violation of his procedural due process rights on the basis of State Defendants' failure to comply with the procedures proscribed by Article 9. (Id.)

Defendants object, arguing that because Plaintiff's allegations are contradicted by the very documents Plaintiff annexed to the Amended Complaint, this claim is insufficient to defeat a motion to dismiss. (State Defs.' Obj. at 16 (citing Koulkina v. City of New York, 559 F. Supp. 2d 300, 329 (S.D.N.Y. 2008); Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002)).) In other words, State Defendants appear to argue that Plaintiff has not sufficiently pleaded that Defendants Gonzales and Ninan failed to examine him because his Amended Complaint reflects that Gonzales and Ninan signed certifications in which they swore

17

that they examined him. For support, State Defendants point to two decisions issued by courts in the Southern District of New York: Koulkina and Matusovsky.

In Koulkina, the court dismissed the plaintiff's claim for medical malpractice based on her allegation that the doctor did not treat her left knee sprain because it was contradicted by the plaintiff's other allegations (that the physician ordered an x-ray and MRI of the knee, and that he referred the plaintiff to physical therapy and consultation with an orthopedist) and exhibits appended to her complaint (including a document reflecting that plaintiff received physical therapy as well as the physician's referral form indicating than an MRI and x-ray were negative). 559 F. Supp. 2d at 329. In Matusovsky, although the plaintiff had signed a contract purporting to release his former employer from any liability with respect to present claims, he argued that the release was invalid because it was not supported by any consideration. 186 F. Supp. 2d at 399. In granting the defendant's motion to dismiss, the court reviewed the contract—which plaintiff incorporated into his complaint by reference—and found that despite the plaintiff's allegation, the release, on its face, evidenced sufficient consideration. Id. at 401 (noting contract reflected that in exchange for plaintiff's general release, defendant relinquished its right to pursue certain claims against plaintiff for possession of its property, to which plaintiff was not already entitled).

Not only are these decisions not binding on this court, but they are also distinguishable. Most importantly, nothing in Plaintiff's Amended Complaint or the attached documents actually contradicts his allegation that Gonzales and Ninan signed the certifications even though they never examined him. In fact, Plaintiff's claims are premised on the fact that Gonzales and Ninan signed the certifications; if anything, these documents support his allegations. Thus, Koulkina and Matusovsky are inapposite. Moreover, Plaintiff's Amended Complaint does not, for

18

example, allege that Gonzales and Ninan failed to certify that they examined him, while simultaneously incorporating documents reflecting that Gonzales and Ninan signed statements indicating they had examined him. Cf. Koulkina, 559 F. Supp. 2d at 329 (noting that while plaintiff alleged physician failed to treat her, she also alleged physician ordered diagnostic images and referred her to physical therapy). Nor does Plaintiff's Amended Complaint allege facts that are contradicted by the relevant document on its face, which would be the case, for example, if he had alleged that the certifications failed to reflect the dates he was purportedly examined—even though they clearly convey those facts. Cf. Matusovsky, 186 F. Supp. 2d at 399 (rejecting plaintiff's claim of lack of consideration where contract unambiguously reflected mutual relinquishment of parties' rights); 2002 Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Life Assurance Co., --- F. Supp. 3d ---, 2015 WL 1455805, at *32 & n.10 (S.D.N.Y. Mar. 31, 2015) (refusing to accept as true plaintiff's allegation that defendants reported "grossly higher" assets on one occasion, when documents on which plaintiff relied reflected that in the two reports at issue, defendants indicated their assets were $169 million and $170.7 million, respectively); In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 223 (E.D.N.Y. 2003) (dismissing claim that defendants concealed material terms of patent settlement when complaint simultaneously acknowledged press release that disclosed material terms).

Moreover, Plaintiff's claim that Gonzales and Ninan never examined him is a factual allegation, not an inference or legal conclusion. Cf. Koulkina, 559 F. Supp. 2d at 329 (alleging defendant failed to "treat" plaintiff in context of medical malpractice claim); Matusovsky, 186 F. Supp. 2d at 399 (plaintiff alleged contract lacked consideration and was therefore "illusory"). As such, the court must accept this allegation as true for the purpose of State Defendants' motion. While a court need not accept as true the allegations in a complaint when they are

contradicted by documentary evidence from the exhibits attached to that complaint, see L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011), where, as here, the attached documents do not contradict the allegations, that exception does not apply, see Lawrence R. Buchalter, 2015 WL 1455805, at *14.

Furthermore, Plaintiff's claim—at least with respect to this specific allegation—is not of the "unadorned, the-defendant-unlawfully-harmed-me" variety. Iqbal, 556 U.S. at 678. Rather, he points out other facts that give rise to the plausible inference of liability. For example, Plaintiff points out that his Creedmoor "Progress Notes" are devoid of any reference to examinations conducted by Gonzales or Ninan (Am. Compl. at 7), even though they reflect Plaintiff's numerous interactions with Creedmoor staff between December 4 and December 6, 2012 (see id. app. at 21-29). In addition, Plaintiff highlights the striking similarity between the comments in the two certifications and the August 2012, reports. (Am. Compl. at 7.) While similar phraseology may be merely "consistent with" Plaintiff having displayed the same symptoms of mental illness three months later, see Iqbal, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (citation and internal quotation marks omitted)), the content and tone of the doctors' comments lack any direct indicia of personal observation. (See Am. Compl. app. at 17 (Gonzales certification ("The patient has paranoid [sic] (believes that there is a conspiracy against him) with limited insight. At present the patient has been refusing any treatment. The patient needs inpatient stabilization.")); id. at 18 (Ninan certification ("The patient appeared to lack capacity to cooperate rationally in his defence [sic] and felt to be not fit to proceed. He presented mainly with paranoi[d] delusions, persecutory typ[e] and poor insight. The patient needs inpatient hospitalization.")).)

Thus, assuming the truth of Plaintiff's uncontradicted factual allegations, and drawing all reasonable inferences in Plaintiff's favor, ATSI Commc'ns, 493 F.3d at 98, the court finds that Plaintiff's claim that Defendants Gonzales and Ninan violated his procedural due process right is plausible, and thus sufficient to defeat a motion to dismiss, particularly in light of Plaintiff's pro se status. See Sealed Plaintiff, 537 F.3d 185, 191 (noting "'dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases'" (quoting Boykin v. KeyCorp., 521 F.3d 202, 216 (2d Cir. 2008))). Accordingly, State Defendants' objection on this basis is OVERRULED.

### b. Predeprivation Hearing

Next, State Defendants object to Judge Go's recommendation that the court find that Plaintiff has stated a procedural due process claim based on their failure to afford him a hearing prior to his involuntary commitment at Creedmoor under Article 9 of New York's Mental Hygiene Law. As the following discussion illustrates, this objection is specific and thus justifies de novo review.

### i. Legal Standard

"Civil commitment for any purpose requires due process protection." Project Release v. Provost, 722 F.2d 960, 971 (2d Cir. 1983) (citing Vitek v. Jones, 445 U.S 480, 491-92 (1980)). Due process usually requires "some kind of hearing before the State deprives a person of liberty or property." Zinermon v. Burch, 494 U.S. 113, 127 (1990). As the Supreme Court has observed, however, "[d]ue process . . . is a flexible concept that varies with the particular situation." Id. Thus, "[i]n some circumstances . . . the Court has held that a statutory provision for a postdeprivation hearing . . . satisfies due process." Id. at 128. "[A] postdeprivation hearing might satisfy due process where a predeprivation hearing is 'unduly burdensome in proportion to the liberty interest at stake,' or 'where the State is truly unable to anticipate and prevent a

random deprivation of a liberty interest.'" Bailey v. Pataki, 708 F.3d 391, 401 (2d Cir. 2013)

(quoting Zinermon, 494 U.S. at 132). "'[W]here the State feasibly can provide a predeprivation

hearing,' however, 'it generally must do so regardless of the adequacy of a postdeprivation . . .

remedy.'" Id. (quoting Zinermon, 494 U.S. at 132).

In Zinermon, the plaintiff was a patient admitted to a state mental health hospital after

completing voluntary admission forms. 494 U.S. at 119. The plaintiff later alleged that he was a

paranoid schizophrenic and had been unable to give informed consent to his admission. Id.

at 118, 120-21. The patient brought a § 1983 suit alleging defendants violated his procedural due

process rights, in part, by failing to provide a predeprivation hearing, which state law required

for patients who were committed involuntarily. Id. at 123-24. In deciding what procedural

protections were constitutionally required, the Court applied the factors outlined in Mathews v.

Eldridge, 424 U.S. 319, (1976), which include:

> [f]irst, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

Id. at 127 (quoting Mathews, 424 U.S. at 335). Applying these factors, the Court determined that

the plaintiff had stated a valid procedural due process claim, first, because the deprivation of

liberty was predictable. Id. at 136. Specifically, the Court reasoned that although it was "hardly

unforeseeable that a person requesting treatment for mental illness might be incapable of

informed consent," there was no process for determining whether a patient was competent before

he was asked to sign admissions forms. Id.; see also id. (noting that any erroneous deprivation

"will occur, if at all, at a specific, predictable point in the admission process—when a patient is

given admission forms to sign"). Second, the court pointed out that predeprivation process was

not impossible, in light of the fact that state law already provided an established procedure for committing involuntary patients. Id. at 136-37. As a result, the Court rejected the defendants' argument that the state was not in a position to predict or avert the deprivation of plaintiff's due process rights. Id. at 138.

In Project Release, which predated the Supreme Court's decision in Zinermon, the Second Circuit upheld the constitutionality of New York's civil commitment scheme against a facial due process challenge brought by a not-for-profit corporation composed of individuals who had been treated in New York State mental hospitals as voluntary, involuntary, or emergency patients. See 722 F.2d at 963, 971. The court explicitly rejected appellants' argument, among others, that Article 9 violates due process by failing to require (a) automatic preliminary probable cause hearings within 48 hours of admission, and (b) full commitment hearings within five days of admission. Id. at 974, 975 (reasoning that "due process issues should not be resolved in terms of required days, hours, or minutes, but should rather turn on the basis of the interests involved and fundamental fairness" (citations and internal quotation marks omitted)). The court specifically left open, however, the possibility of an as-applied challenge. Id. at 971.

The Second Circuit then considered an as-applied challenge to Article 9 in Charles W. v. Maul, where the plaintiff had been committed to OMH custody pursuant to New York Criminal Procedure Law sections 730.40 and 730.60, after having been found incompetent to stand trial for a misdemeanor offense. 214 F.3d 350, 353-54 (2d Cir. 2000). The court held that the defendants did not violate the plaintiff's due process rights by confining him for up to 72 hours in order to evaluate him and determine whether to initiate civil commitment proceedings. Id. at 359-60. Citing the Supreme Court's decision in Jackson v. Indiana, 406 U.S. 715 (1972), the

court wrote that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Id. at 358 (quoting Jackson, 406 U.S. at 738). Applying this standard, the Second Circuit held that the State's "legitimate interests justify confining those found incompetent to stand trial for a reasonable evaluation period," and that the State "has need of the reasonable flexibility afforded it by a limited time to decide whether to initiate civil commitment proceedings and then, if necessary, to initiate them." Id. at 359; see also id. ("The state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed.").[6]

More recently, in Bailey, the Second Circuit considered procedural due process claims brought by inmates in New York State correctional facilities who were involuntarily committed to mental hospitals pursuant to the Article 9 process following the expiration of their sentences for criminal offenses of a sexual nature. 708 F.3d 391. There, the plaintiffs argued they were denied their rights to due process when they were committed to psychiatric institutions without the benefit of notice, psychiatric examinations by court-appointed physicians, or judicial hearings prior to their commitment. Id. at 399. On appeal, the court held that "[e]xcept for emergent or otherwise unusual circumstances, such as where an emergency makes it necessary for the State to act immediately to avoid imminent harm to the person being restrained or to the public, or where predeprivation process is highly impracticable, the Supreme Court has long held that 'the Constitution requires some kind of a hearing before the State deprives a person of liberty.'" 708 F.3d at 407 (quoting Zinermon, 494 U.S. at 127).

---

[6] The Second Circuit did not discuss Zinermon in its constitutional analysis.

In concluding that the plaintiffs had stated a claim under § 1983, the court relied heavily on the Supreme Court's decision in Zinermon.[7] See, e.g., id. at 401-02 ("The deprivation here seems to us to have been as foreseeable as it was in Zinermon."). Applying that decision, the court noted that the deprivation of liberty occurred at a predictable point—the expiration of the inmate's sentence—and thus "[n]othing that occurred . . . was random or unanticipated so as to prevent the State from planning for and then providing predeprivation process." Id. at 402. The court also found that application of the Mathews balancing test supported the conclusion that the postdeprivation remedies provided for in Article 9 were constitutionally insufficient in that case. Id. at 402. Addressing plaintiffs' liberty interests, the court pointed out that an inmate committed to a psychiatric hospital under the program at issue could not gain release until he secured either employment or vocational training. Id. Regarding the risk of erroneous deprivation, the court noted that the OMH physicians charged with examining the prisoners were unfamiliar with examining sex offenders and were utilizing a new standard with which they had no experience. Id. at 402-03.

With respect to the Government's interest, the court observed that under Article 9, "the defendants should have been prepared to present their case for civil commitment at a hearing on five-days notice at any point after a civil commitment was effected. It [did] not follow that they could not have prepared for such a hearing in advance of commitment without incurring substantial additional expense or effort." Id. at 403. Moreover, the court pointed out that "[t]he sole reason that holding predeprivation hearings would have unduly burdened the State is that a decision was made to create and implement the [inmate commitment program] on a compressed timeline; any exceptional burden that the State faced was of its own making." Id. As a result,

---

[7] The Second Circuit did not mention Charles W. in its discussion in Bailey.

the Second Circuit concluded that it could not "reasonably be argued that predeprivation procedural protections were 'unduly burdensome' in comparison with the substantial liberty interest at stake." Id.

In finding that the defendants were not entitled to qualified immunity, the court drew several important distinctions from other cases in which the failure to provide a predeprivation hearing was found not to violate due process. For example, the court noted that the inmates in Bailey were confined not on the basis of "immediate and acute dangerousness," but rather "potential recidivism" five, ten, or fifteen years after their release. Id. at 407. The court also emphasized the significant negative effect of the label imposed on the inmates, as sexually violent predators ("SVPs"), which "connotes a likelihood of recidivist sexually violent behavior." Id. at 402, 407. In addition, the Second Circuit pointed out that the State's decision to apply the Article 9 procedures was made "despite the fact that there was a law in place, which outlined civil commitment procedures for those already incarcerated and which clearly provided for a predeprivation hearing." Id. at 408. Finally, and most important here, the Bailey court distinguished Project Release, noting that Project Release held that "involuntary commitment without an automatic hearing within 48 hours was constitutional when dealing with 'persons with a mental illness "for which care and treatment in a hospital is essential to such persons' welfare and whose judgment is so impaired that [they are] unable to understand the need for such treatment."'" Id. at 405 (quoting Project Release, 722 F.2d at 972 (quoting N.Y. Mental Hyg. Law §§ 9.01, 9.27)). By contrast, the court reasoned that this was not the population at issue in Bailey, nor the standard that was applied. Id.

ii.    Application

In this case, Plaintiff was not afforded a hearing prior to his conversion to involuntary status at Creedmoor on December 5, 2012. Instead, only after he made a request pursuant to

26

New York Mental Hygiene Law § 9.31 did he receive a hearing, which took place on

January 2, 2013—almost one month later. State Defendants do not argue that Plaintiff's

involuntary commitment represented an "emergency" situation. See Bailey, 708 F.3d at 407.

Consequently, the issue is whether the circumstances of Plaintiff's admission presented

"otherwise unusual circumstances" such that predeprivation process was "highly impracticable."

Id.; see also id. at 401 (noting that a postdeprivation hearing might satisfy due process where

predeprivation hearing is "'unduly burdensome in proportion to the liberty interest at stake'"

(quoting Zinermon, 494 U.S. at 132)).

Without conducting an independent assessment of the Mathews factors, but citing Bailey,

Judge Go determined that providing Plaintiff with a predeprivation hearing "would not have

been 'unduly burdensome' in light of the significant liberty interest at stake." (R&R at 24.)

Pointing out that Plaintiff had been in custody for almost 90 days after Justice Schecter issued

the Final Order before he was involuntarily committed, Judge Go reasoned that State Defendants

"had ample time here to provide plaintiff with a pre-deprivation hearing." (Id.) Accordingly,

Judge Go recommended finding that Plaintiff stated a procedural due process claim based on

State Defendants' failure to do so. (Id.)

In their objection, State Defendants argue both that predeprivation process was highly

impracticable, as well as unduly burdensome in proportion to Plaintiff's liberty interest. They

point out that at the time the Final Order was issued, on September 7, 2012, Plaintiff was

detained in City custody at Rikers Island awaiting the disposition of criminal charges in New

York Supreme Court, Bronx County. (State Defs.' Obj. at 8.) As a result, State Defendants

contend they could not have arranged a predeprivation hearing because they did not know in

advance when Plaintiff's charges would be resolved or when the City would transfer him to State

custody. (Id.) Moreover, State Defendants argue, the fact that Plaintiff was in City custody also meant that even if they had been granted access to Rikers to evaluate him—the possibility of which they remain skeptical—the results of any subsequent hearing could not have been implemented until he was released. (Id.) Furthermore, State Defendants point out that because the results of any such hearing might not necessarily have been implemented within a short period of time, the physicians' evaluation of Plaintiff's possible mental illness and dangerousness would become stale.[8] (Id. at 10.) For these reasons, and for others that follow, State Defendants' objection is SUSTAINED.

As the court has already noted, "[d]ue process . . . is a flexible concept that varies with the particular situation." Zinermon, 494 U.S. at 127. Having applied the Mathews factors to the unique facts presented here, the court is convinced that requiring a predeprivation hearing would be "unduly burdensome in proportion to the liberty interest at stake." Bailey, 708 F.3d at 401 (quoting Zinermon, 494 U.S. at 132). Moreover, analyzing these factors illustrates that there are several important distinctions between the circumstances in this case and those facing the Supreme Court in Zinermon and the Second Circuit in Bailey.

The first factor is the private interest that will be affected by the official action. See Zinermon, 494 U.S. at 127. There is no doubt, as State Defendants concede, that Plaintiff has a significant liberty interest in avoiding commitment to a mental hospital. (See State Defs.' Obj. at 9.) But the deprivation of liberty at issue in this case is not as significant as it was in Zinermon or Bailey. In Zinermon, although the plaintiff could have requested discharge at any

---

[8] More specifically, State Defendants argue that they were restricted by Mental Hygiene Law section 9.05, which requires that the psychiatric examination take place "within ten days prior to the date of admission." N.Y. Mental Hyg. Law § 9.05(b). (See State Defs.' Obj. at 10.) Consequently, "if Plaintiff's pending criminal charges were not resolved within ten days after execution of the certificates and application, the procedure would have to be repeated." (Id.) State Defendants' point regarding staleness is well taken. However, if Plaintiff has a procedural due process right to a predeprivation hearing, it is the New York statute that will have to be adapted to the Constitution, not the other way around. See U.S. Const. art. VI, cl. 2.

time, as an alleged voluntary patient he could have been treated indefinitely—so long as the patient and his legal guardian or representatives were notified every six months of their right to apply for a discharge. 494 U.S. at 123. Ultimately, the plaintiff was committed for five months without receiving any process. Id. at 120. In Bailey, the plaintiffs had been committed, and they were unable to gain release until they had secured either employment or vocational training, "despite the fact that any potential employer must be notified of [their sexually violent predator] status." 708 F.3d at 402. Moreover, they were subject to specialized mental health treatment for sexual offenders, which included the use of a "penile plethysmograph," among other treatments. Id.

The treatment Plaintiff allegedly received at Creedmoor, by contrast, was not nearly as lengthy or invasive. Even if Plaintiff had not requested a hearing, New York's Mental Hygiene Law requires that within sixty days of the admission of an involuntary patient, a hospital director must seek a court order to further retain the patient. See N.Y. Mental Hyg. Law § 9.33(a); see also Bailey, 708 F.3d at 394. Even where the director succeeds in doing so, the effective period of any such order is limited to six months or less. See id. § 9.33(b). If the director subsequently determines that the patient requires further retention, the court is not permitted to extend the patient's treatment for a period longer than one year unless the patient appears personally before the court. See id. § 9.33(d).

The second factor, the risk of an erroneous deprivation through the procedures used, also favors against a finding of a predeprivation hearing right in this case. In Zinermon, the plaintiff was committed to a state mental hospital as a voluntary patient without receiving any process to determine whether he was capable of giving consent. 494 U.S. at 122-24. In Bailey, inmates were selected for possible commitment to psychiatric institutions solely on the basis of their prior

convictions for sexual offenses, regardless of whether they were on the state's mental health caseload.[9] See 708 F.3d at 395-96. Those inmates who were eventually committed involuntarily did not receive any advance written notice of their commitment, and were committed on the basis of evaluations conducted by physicians tasked with estimating the inmates' risk of future recidivism. See id. at 399, 402-03. These physicians, however, were not familiar with applying this standard, which had not been previously used in the state's civil commitment process. Id. at 397, 402-03.

By contrast, a defendant whose misdemeanor indictment is dismissed under New York Criminal Procedure Law section 730.40, and then involuntarily committed to a state mental hospital under section 9.27, receives more process and is evaluated under a more rigorous framework. Plaintiff was transferred to Creedmoor for evaluation only as a result of a court order issued under section 730.40 finding that he was incompetent to stand trial by reason of mental defect. The court made this finding on the basis of examinations conducted by two forensic psychiatrists, who both determined that Plaintiff lacked the capacity to understand the proceedings against him or to assist in his own defense, and therefore found him to be an "incapacitated person" under state law.

Once Plaintiff arrived at Creedmoor, Article 9 required that three physicians examine him to confirm the need for involuntary commitment.[10] See N.Y. Mental Hyg. Law § 9.27(a), (e);

---

[9] The Second Circuit also emphasized that the risk of an erroneous deprivation was enhanced by the significant political pressure underlying the State's decision to implement the initiative to indefinitely detain sex offenders. See 708 F.3d at 403.

[10] As discussed above, Plaintiff argues that two of these three physicians never actually examined him, which the court found to be sufficient to state a separate procedrual due process claim. See supra Part III.A.1.a. Judge Go did not rely on this allegation, however, in determining that Plaintiff stated a due process claim based on the violation of his right to a predeprivation hearing. Rather, her recommendation was primarily based on the fact that 90 days had elapsed between the issuance of the Final Order and Plaintiff's conversion to involuntary status at Creedmoor. (See R&R at 24.) Moreover, if Plaintiff's predeprivation hearing right was based, at least in part, on whether Creedmoor complied with Article 9, these two claims would cease to be distinct.

see also id. § 9.27(d) ("Before an examining physician completes the certificate of examination of a person for involuntary care and treatment, he shall consider alternative forms of care and treatment that might be adequate to provide for the person's needs without requiring involuntary hospitalization."). The Second Circuit in Bailey also distinguished this process, noting that, under Article 9, three physicians are required to certify that the patient is a "person[] with a mental illness 'for which care and treatment in a hospital is essential to such persons' welfare and whose judgment is so impaired that [he is] unable to understand the need for such treatment.'" Bailey, 708 F.3d at 405 (quoting Project Release, 722 F.2d at 972 (quoting N.Y. Mental Hyg. Law §§ 9.01, 9.27)). Moreover, at least one of these examining physicians (designated by the director of the hospital) must certify that the patient's mental illness is "likely to result in serious harm to himself . . . or others," N.Y. Mental Hyg. Law § 9.37(a), although all three examining physicians at Creedmoor made this determination in Plaintiff's case.[11]

In addition, the probable value of additional or substitute procedural safeguards would have been minimal in these circumstances. The value of predeprivation safeguards is negligible, for example, when the deprivation involves unauthorized conduct by prison employees leading to the negligent loss of inmate mail, or the malicious destruction of inmate property. See Zinermon, 494 U.S. at 128-29 (citing Parratt v. Taylor, 451 U.S. 527, 541, 543-44 (1981); Hudson v. Palmer, 468 U.S. 517, 533-35 (1984)). In those cases, "the very nature of the deprivation made predeprivation process 'impossible.'" Id. at 137. The value of predeprivation safeguards was not negligible, however, in Zinermon, where the Supreme Court distinguished Parratt and Hudson; the Court noted that when the admission of voluntary patients to mental

---

[11] Whether that determination was substantively reasonable is a separate question. See infra Part III.A.2.

hospitals was clearly authorized under state law, predeprivation process—to determine whether the patient was capable of giving consent—had probable value.

Here, the probable value of additional process was minimal, but for a different reason than in Parratt and Hudson. In Parratt and Hudson, the value of predeprivation process was negligible because the deprivation was both unpredictable and unauthorized. By suggesting that State Defendants had "ample time" to afford Plaintiff a predeprivation hearing because he was in custody "for almost 90 days" following issuance of the Final Order, Judge Go focused on whether the deprivation was "predictable."[12] (See R&R at 24.) But it is irrelevant whether State Defendants had time to provide a predeprivation hearing, if State Defendants had no authority to implement the results of any such hearing. Even if State Defendants were aware that (1) Plaintiff had been found incapacitated under section 730.40, and (2) Plaintiff would be designated to Creedmoor—which Plaintiff does not allege and for which there is no factual support—"[a]s long as Plaintiff was facing criminal charges and was subject to a determination by the criminal court, he could not be released or hospitalized pursuant to a civil hearing." (State Defs.' Obj. at 8.) Consequently, had State Defendants afforded him a predeprivation hearing that resulted in a determination that Plaintiff did not currently meet the standard for involuntary commitment, unless he had been released into State custody, there would be no value in providing this hearing, because it would have no effect on Plaintiff's liberty.[13] This situation is therefore unlike Zinermon or Bailey, where the defendants' own institutions had confined the plaintiffs.

---

[12] But see infra Part III.A.1.b.ii (addressing whether the deprivation was in fact predictable with respect to these particular Defendants).

[13] Of course, in other circumstances, when the prospective patient is not currently detained by criminal authorities pursuant to unresolved charges, a predeprivation hearing would be of probable value. See Bailey, 708 F.3d at 403 ("If the plaintiffs were afforded notice and a hearing prior to their commitments, the decision as to whether to commit would have been undertaken by a neutral decisionmaker with the benefit of an adversarial hearing.").

The third, and last, <u>Mathews</u> factor is the Government's interest, in light of which the court considers the fiscal and administrative burdens that the additional procedural requirement would entail. In finding that predeprivation process was not impossible, the Supreme Court in <u>Zinermon</u> noted that existing state law already provided an established procedure for patients admitted through involuntary placement proceedings; it just failed to apply this process to another group of patients—those who were unable to consent.[14] <u>See</u> 494 U.S. at 136-37. Similarly, in <u>Bailey</u>, the Second Circuit rejected the defendants' claim that conducting predeprivation hearings prior to the expiration of the inmates' sentences would have imposed a substantial burden, reasoning, in part, that under the provisions of Article 9, the defendants should have been prepared to present their case for civil commitment on as little as five-days' notice. 708 F.3d at 403; <u>see also</u> N.Y. Mental Hyg. Law § 9.31(a) (requiring hearing on involuntary admission within five days of receipt by hospital director of request for such hearing). Neither <u>Zinermon</u> nor <u>Bailey</u>, however, compels the same conclusion here.

As State Defendants point out, it is essential that examination of a patient's mental health take place within a short period of time before the decision to commit is made—otherwise evidence of the patient's mental illness and dangerousness would become stale. (<u>See</u> State Defs.' Obj. at 10.) <u>See also</u> N.Y. Mental Hyg. Law § 9.05(b) ("A certificate, as required by this article, must show that the person is mentally ill and shall be based on an examination of the person alleged to be mentally ill made <u>within ten days prior to</u> the date of admission." (emphasis added)). After the Final Order was issued, however, Plaintiff remained in City custody, awaiting resolution of outstanding criminal charges in Bronx County. Plaintiff does not allege that State

---

[14] Significantly, under the "established procedure" in question, a patient could be held for up to five days without a hearing, in order for the state to evaluate the patient to determine whether to initiate involuntary placement proceedings. <u>See</u> <u>Zinermon</u>, 494 U.S. at 122.

Defendants had knowledge of when these charges would be resolved or when he would be transferred to State custody. Moreover, the records provided to Judge Go indicate that it was not until December 3, 2012, that Creedmoor was designated to receive Plaintiff. (See Forensic Designation Form (City Defs.' Sept. 27, 2013 Ltr., Ex. A (Dkt. 71-1)); CPL Designation Notification (Velez Ltr., Ex. B) at 2.) While it may be reasonable to infer that OMH and its Commissioner[15] received notice of the Final Order some time after it was issued on September 7, 2012, see N.Y. Crim. Proc. Law § 730.60(1) (requiring local criminal court to notify Commissioner of final order of observation), Plaintiff does not allege that State Defendants—exclusively Creedmoor personnel—were aware of Plaintiff's case or that he would be designated to Creedmoor by OMH prior to December 3, 2012.[16] But again, even if State Defendants did know that Plaintiff would be designated to Creedmoor before that date, the fact that Plaintiff was detained at Rikers on pending criminal charges in the Bronx meant that these Defendants had no way of conducting an evaluation or affording Plaintiff a hearing that they could be reasonably certain would reflect Plaintiff's mental health and potential dangerousness at the time of, or just shortly before, Plaintiff's involuntary admission.

In other words, the need to determine Plaintiff's status did not arise at a "predictable point." Cf. Zinermon, 494 U.S. at 136; Bailey, 708 F.3d at 402. The Final Order issued on September 7, 2012, and was set to expire 90 days later, on December 6, 2012—just three days after Creedmoor was designated to receive Plaintiff, and two days after Plaintiff was delivered. The fact that a significant period of time followed issuance of the Final Order does not imply that

---

[15] Plaintiff has agreed to the dismissal without prejudice of his claim against Defendant Hogan.

[16] The court notes that Plaintiff's last court date in Bronx County prior to his commitment was on November 28, 2012—five days before OMH designated Plaintiff to Creedmoor. (See Case Details, Best, No. 2012BX049460 (N.Y. Crim. Ct.) at 2.) Plaintiff has not alleged, however, that Creedmoor was aware by November 28 that it would be designated to receive Plaintiff, nor is there any factual support for that inference.

these Defendants could have known—at that time—when that period would end.[17] These circumstances are thus unlike Zinermon, where the issue of patients' competency would naturally arise at the point of signing admissions forms, 494 U.S. at 136; and unlike Bailey, where the defendants actually knew when the inmates' sentences would expire, 708 F.3d at 402. Here, in light of the need to obtain a sufficiently current assessment of Plaintiff's mental health, these Defendants did not have "ample time" to provide Plaintiff with a predeprivation hearing (cf. R&R at 24), when Creedmoor was not designated to receive Plaintiff until December 3, 2012—one day before he was delivered into State custody—and three days before the Final Order would have expired.[18] See also Charles W., 214 F.3d at 359 ("The state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed.").

If the court were to hold that Plaintiff must be afforded a predeprivation hearing in these circumstances, the only way State Defendants could have provided the decisionmaker with a current evaluation of his mental health would be by conducting repeated examinations, in the hope that one would be current by the time Plaintiff was released from City custody. The burden this would impose on the State is truly substantial and unjustified, particularly where, as here, Plaintiff's Bronx charges were pending for 88 days after the Final Order issued. This burden would have been even more unjustifiable if the Final Order had expired—as it nearly did in this

---

[17] For example, given these facts, it is just as likely that the Commissioner assumed the 90-day effective period of the Final Order would expire before Plaintiff was delivered into State custody. Thus, in this context, it is notable that the State was able to determine whether to commit Plaintiff in two days—less than the 72-hour maximum.

[18] State Defendants further argue that even if they could have known when Plaintiff would be transferred into State custody, it is unlikely they would have been able to evaluate Plaintiff because he was in a City jail and "subject to the procedures and determinations of the criminal court." (State Defs.' Obj. at 8.) Because there are other reasons for finding that a predeprivation hearing was not required in these circumstances, the court need not consider this somewhat vague argument, which effectively speculates that it would have been challenging for State psychiatrists to meet with Plaintiff at Rikers.

case. The court will not require the State to conduct multiple exercises in futility, at significant cost. Moreover, as the Second Circuit has previously observed, these costs must be weighed against the State's legitimate interests "in caring for the mentally ill and in promoting community safety." Charles W., 214 F.3d at 359.

Thus, considering the Mathews factors together, the court finds that in these circumstances, requiring a predeprivation hearing would be unduly burdensome in proportion to the liberty interest at stake. Accordingly, the court holds that where a plaintiff is adjudicated unfit to stand trial under New York Criminal Procedure Law section 730.40 in one proceeding, but remains incarcerated in City custody pursuant to unrelated criminal charges in another proceeding, the Fourteenth Amendment's Due Process Clause does not require that the plaintiff receive a predeprivation hearing before he is transferred to State custody and committed involuntarily through civil process to a mental hospital for treatment pursuant to Article 9 of New York's Mental Hygiene Law. Consequently, State Defendants' objection is SUSTAINED, and Judge Go's R&R is REJECTED in this respect. Of Plaintiff's two procedural due process claims, only his claim related to the physician certification survives State Defendants' motion to dismiss.

2.     Substantive Due Process

State Defendants also object to Judge Go's recommendation that the court deny their motion to dismiss Plaintiff's substantive due process claim that he was committed to Creedmoor without a finding that he was a danger to himself or others. (See R&R at 19-21.) In reasoning that Plaintiff had stated a claim, Judge Go made several observations. She first pointed out that "[o]ther than the form language contained therein," there was no information contained in State Defendants' application for involuntary admission that stated Plaintiff was dangerous. (Id.

36

at 20.) Judge Go also observed that Plaintiff's Creedmoor Progress Notes indicated he had not displayed any "violent, assaultive, threatening[,] or aggressive behavior." (Id.) She further noted that Plaintiff's criminal charges in the New York County complaint were misdemeanors—not felonies—and involved conduct in 2010 and 2011. (Id.) Finally, Judge Go reasoned that while a Creedmoor physician testified at both of Plaintiff's Article 9 hearings that he was "potentially dangerous," this testimony "involved facts challenged by plaintiff" and was contrary to Defendant Gonzales's certification that Plaintiff had "no prior psychiatric hospitalizations." (Id. at 21.)

State Defendants object on two grounds. They first argue that Judge Go's R&R minimizes Plaintiff's "serious history of dangerous behavior, especially toward women." (State Defs.' Obj. at 13.) Second, State Defendants contend that Judge Go failed to give appropriate deference to the psychiatrists' judgment that Plaintiff was mentally ill and dangerous—a judgment, they note, that was twice upheld following evidentiary hearings by justices of the New York Supreme Court. (Id.) These objections are specific, and thus entitled to de novo review.

### a.  *Legal Standard*

"Substantive due process prohibits states from involuntarily committing nondangerous mentally ill individuals." Bolmer v. Oliveira, 594 F.3d 134, 142 (2d Cir. 2010) (citing O'Connor v. Donaldson, 422 U.S. 563, 575-76 (1975)); see also Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) ("As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others."). "It does not, however, 'require a guarantee that a physician's assessment of [dangerousness] be correct.'" Id. (alteration in original) (quoting Rodriguez, 72 F.3d at 1062); see also Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (for executive action to violate substantive due process, it must be "so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience"). "[A] physician's decision to involuntarily commit a mentally ill person because he poses a danger to himself or others shocks the conscience, thereby violating substantive due process, when the decision is based on 'substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community.'" Bolmer, 594 F.3d at 143 (quoting Rodriguez, 72 F.3d at 1063); see also Youngberg v. Romeo, 457 U.S. 307, 323 (1982) ("[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." (footnote omitted)).

What those standards are, however, is a question of fact. Bolmer, 594 F.3d at 142 (citing Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 191-92 (2d Cir. 2005)); see also Rodriguez, 72 F.3d at 1063 ("To the extent [a prior Second Circuit decision] may be interpreted as suggesting that a physician's mere making of a finding satisfies the requirements of either the statute or due process, we reject that suggestion."). As the Second Circuit has previously explained, a doctor's decision to commit a person involuntarily under Article 9 "does not ordinarily involve matters within the layman's realm of knowledge." Olivier, 72 F.3d at 190 (citation and internal quotation marks omitted). Rather, "determining the presence of mental illness and the potential effects thereof are 'to a large extent based on medical "impressions" drawn from subjective analysis and filtered through the experience of the diagnostician.'" Id. (quoting Addington v. Texas, 441 U.S. 418, 430 (1979)). "Consequently, '[w]hether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which [typically] must be interpreted by expert psychiatrists and psychologists.'" Id. at 191 (quoting Addington, 441 U.S. at 429); see also

Rodriguez, 72 F.3d at 1063 (reversing district court's grant of summary judgment on the question of what the generally accepted medical standards were).

### b. Application

State Defendants' first ground for objection emphasizes that Plaintiff had a history of committing crimes against women, pointing to prior convictions of rape (without citation) and sexual abuse (with citation), and argues that this criminal history is relevant to a determination of dangerousness, especially where Plaintiff was accused of stalking, before those charges were dismissed pursuant to the Final Order. (See State Defs.' Obj. at 15 (citing Charles W., 214 F.3d at 359).) The court does not dispute the relevance of this information. See also Project Release, 722 F.2d at 973-74 (noting Article 9 of New York's Mental Hygiene Law does not require proof of overt act evidencing dangerousness). But State Defendants overlook a critical problem with their analysis. While Plaintiff's stalking charges and prior convictions may be relevant to the question whether Plaintiff presented a danger to himself or others, these observations alone are insufficient to establish that State Defendants' findings were not substantially below the standards generally accepted in the medical community.[19] See Olivier, 72 F.3d at 191. Ultimately, there may be no genuine issue of material fact regarding State Defendants' assessment of Plaintiff's dangerousness. If there is a triable issue, State Defendants could prove at trial that their findings met or exceeded the generally accepted medical standards. Nonetheless, in light of the standard State Defendants must meet on a motion to dismiss, the court is unable to conclude that Plaintiff has failed to state a claim.

---

[19] State Defendants argue that "the mere fact that patients may be nonviolent and cooperative in the structured setting of a hospital does not ensure that they will not resume their dangerous behavior if released." (State Defs.' Obj. at 16 (citing Matter of Ford, 645 N.Y.S.2d 27, 28 (App. Div. 1996)).) This point is well taken. It does not, however, establish that Plaintiff presented a substantial threat of harm to himself or others in the first place.

In making this determination, the court does not foreclose the possibility that a plaintiff's mental illness and dangerousness could be so obvious on the face of a complaint or the documents incorporated therein (or other sources of which the court can take judicial notice) that a defendant physician necessarily succeeds on a motion to dismiss without the assistance of expert psychiatrists and psychologists. But this is not "the rare case in which such evidence is unnecessary." Hogan v. A.O. Fox Mem'l Hosp., 346 F. App'x 627, 630 (2009) (summary order); see also Olivier, 398 F.3d at 190 ("'Where a dentist has pulled the wrong tooth or where an unexplained injury has occurred to a part of the body remote from the site of the surgery, expert testimony is not needed' to establish a departure from accepted medical standards." (quoting Sitts v. United States, 811 F.2d at 736, 740 (2d Cir. 1987))).

State Defendants' second ground for objection similarly fails to acknowledge that at this stage of the proceeding, on a motion to dismiss, the court is not in a position to determine whether the psychiatrists' finding that Plaintiff was dangerous was based on substantive and procedural criteria that are "substantially below the standards generally accepted in the medical community." See Bolmer, 594 F.3d at 143. Not only does the court lack any evidence regarding the accepted medical standards generally, but it also has no means of determining whether State Defendants' evaluation in this case fell substantially below those standards. Moreover, the court must accept as true all nonconclusory allegations of fact, and draw all reasonable inferences from those allegations in Plaintiff's favor. Accepting as true Plaintiff's allegation that Defendants Gonzales and Ninan signed their certifications without having personally examined him, this raises a question of fact as to whether the evaluation fell substantially below the standards. See id. Tellingly, State Defendants have not offered—nor has the court's own research uncovered— a single prior decision in this circuit where a district court granted a motion to dismiss a

plaintiff's substantive due process claim on these grounds. And this case does not present an opportunity to be the first.

At this stage, the court is unable to determine whether State Defendants' exercise of professional judgment was "such a substantial departure from accepted professional judgment, practice, or standards that the person responsible actually did not base the decision on such a judgment." Id. at 144. Because the court finds Plaintiff has stated a plausible substantive due process claim, State Defendants' objection is OVERRULED.

### 3. Fourth Amendment

State Defendants also object to Judge Go's recommendation that this court find that Plaintiff's Fourth Amendment claim is adequately alleged. In particular, they argue "many of the same factors are relevant, and for the same reasons discussed with respect to the substantive due process claim, the State Defendants had reasonable grounds to believe that plaintiff was dangerous and required hospitalization." (State Defs.' Obj. at 18.) The court need not decide whether this constitutes a "specific objection," cf. Jemine v. Dennis, 901 F. Supp. 2d 365, 371 (E.D.N.Y. 2012) (district court reviews R&R for clear error where objections consist of conclusory or general arguments), because even under de novo review, the court finds that Plaintiff's claim survives.

It is indisputable that the Fourth Amendment applies in the context of an involuntary civil commitment. Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993) (citing Soldal v. Cook County, Illinois, 506 U.S. 56, 66-67 (1992)). "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993) (quoting Villanova v. Abrams, 972

F.2d 792, 795 (7th Cir. 1992)). The governing legal standard, of course, is Article 9 of the New York Mental Hygiene Law, pursuant to which a patient must be found to be mentally ill and a danger to himself or others. Bolmer v. Oliveira, 594 F.3d 134, 142 (2d Cir. 2010). Ordinarily, a determination that a patient is mentally ill and dangerous is objectively unreasonable when expert testimony establishes that the generally accepted medical standards were allegedly violated. Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 190 (2d Cir. 2005).

At this point in Plaintiff's case, the court has no information regarding what the appropriate medical standards are, and whether State Defendants complied with these standards in finding that Plaintiff was dangerous. Thus, for the same reasons that Plaintiff's allegations were sufficient to state a claim for the violation of his right to substantive due process under the Fourteenth Amendment, Plaintiff's claim under the Fourth Amendment also survives State Defendants' motion to dismiss.[20] See supra Part III.A.2. Accordingly, State Defendants'

---

[20] In the context of § 1983 actions based on a plaintiff's initial involuntary commitment under Article 9 of the New York Mental Hygiene Law, the case law in the Second Circuit has generated what appears to be an open question regarding the relationship between Fourth Amendment claims and substantive due process claims under the Fourteenth Amendment. In Glass, the Second Circuit noted with approval the Ninth Circuit's observation that "[a]lthough confinement of the mentally ill by state action is generally analyzed under the due process clause of the fourteenth amendment, [the court] analyze[s] the distinct right to be free from an unreasonable government seizure of the person for whatever purpose." 984 F.2d at 58 (quoting Maag v. Wessler, 960 F.2d 773, 775 (9th Cir. 1991)). Thus, where a plaintiff has challenged his initial involuntary civil confinement (as opposed to the length of his confinement) under both amendments, many districts courts—as well as the parties in this case—separately analyze the § 1983 claim as both a Fourth Amendment issue and also a substantive due process issue. See, e.g., Carrion v. Singh, No. 12-CV-360 (JFB) (WDW), 2013 WL 639040, at *8-10 (E.D.N.Y. Feb. 21, 2013); Johnson v. Myers, No. 10-CV-1964 (JS) (WDW), 2011 WL 6131003, at *4 (E.D.N.Y. Dec. 6, 2011); Kraft v. City of New York, 696 F. Supp. 2d 403, 412-16 (S.D.N.Y. 2010).

This might appear to be a distinction without a difference: Because the Fourth Amendment test is whether the seizure was reasonable "under the governing legal standard," Glass, 984 F.2d at 58, and the governing legal standard is whether the patient was "dangerous" under Article 9, Olivier, 398 F.3d at 190—a decision that is objectively unreasonable only when the physician's determination violated generally accepted medical practices—the Fourth Amendment and substantive due process inquiries appear to be the same. See, e.g., Johnson, 2011 WL 6131003, at *4 ("The Court has already established that the [] Defendants' involuntary commitment of Ms. Johnson was objectively reasonable in the due process context, it follows that their actions were also objectively reasonable in the Fourth Amendment context."); see also Capellupo v. Nassau Health Care Corp., No. 06-CV-4922 (JFB) (ETB), 2009 WL 1705749, at *12 (E.D.N.Y. June 16, 2009) (finding, on summary judgment, that an involuntary commitment did not violate the Fourth Amendment where "the undisputed facts demonstrate that both examining physicians had reasonable grounds, within the parameters of generally accepted medical standards, for their determination").

objection to Judge Go's recommendation regarding Plaintiff's Fourth Amendment claim is OVERRULED.

### 4. Qualified Immunity

State Defendants further object to Judge Go's R&R, arguing that even if Plaintiff has stated a claim that his Fourteenth and Fourth Amendment rights were violated, they are entitled to qualified immunity because they had not violated any rights that were clearly established by the Supreme Court or the Second Circuit. (State Defs.' Obj. at 11-13, 17-18.) As Judge Go observed, a defendant asserting a qualified immunity defense on a motion to dismiss "faces a formidable hurdle . . . and is usually not successful." Field Day, LLC v. County of Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006). This defense succeeds only where entitlement to qualified

---

But it is unclear whether, in fact, these inquiries are identical. First, it is not obvious that the tests are the same. In Bolmer, the Second Circuit held that "a physician's decision to involuntarily commit a mentally ill person because he poses a danger to himself or others shocks the conscience, thereby violating substantive due process, when the decision is based on substantive and procedural criteria that are . . . substantially below the standards generally accepted in the medical community." 594 F.3d at 143 (citation and internal quotation marks omitted) (emphasis added). In Olivier, the Second Circuit explained the substantive due process inquiry turned, at least in part, on whether such a plaintiff could demonstrate "an objective violation" of the generally accepted medical standards. See 398 F.3d at 190. It is not clear whether "an objective violation of" is the same thing as a "substantial departure from" the generally accepted medical standards. To the extent there is any confusion in the case law, perhaps the source lies in the fact that the leading cases decided by the court of appeals involved only challenges to civil confinement under the Fourteenth Amendment. See generally Bolmer, 594 F.3d at 144-45; Olivier, 398 F.3d 183; Rodriguez, 72 F.3d 1051. The court's research did not reveal any Second Circuit decision, other than Glass, discussing both Fourth and Fourteenth Amendment standards in the context of civil confinement under New York law.

Second, treating Fourth Amendment and Fourteenth Amendment substantive due process claims as separate inquiries may conflict with a fundamental doctrine of constitutional interpretation. Specifically, the Supreme Court has held that, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" Bryant v. City of New York, 404 F.3d 128, 135 (2d Cir. 2005) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality op.)). As a result, at least one district court has refused to consider a separate Fourteenth Amendment substantive due process claim in a case where the plaintiff also alleged that an involuntary commitment violated his Fourth Amendment right. See Bryant v. Steele, 25 F. Supp. 3d 233, 246-47 (E.D.N.Y. 2014). Furthermore, the Fourteenth Amendment might apply in certain circumstances where the Fourth Amendment does not: for example, in the context of a challenge to the length of a confinement.

Neither the parties nor Judge Go acknowledged these issues. But because: (a) the Second Circuit has not yet addressed this specific question in this context; (b) the court is confronted only with a motion to dismiss, and there is not yet evidence of any medical standards; and (c) this is not a case where such testimony is unnecessary, see Olivier, 398 F.3d at 190; resolving these questions is not necessary for the disposition of this motion.

immunity can be established "based [solely] on facts appearing on the face of the complaint." McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004). For this reason, a motion to dismiss "is a mismatch for immunity and almost always a bad ground of dismissal." Id. (citation omitted); see also Barnett v. Mount Vernon Police Dep't, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order).

Critically, however, State Defendants did not pursue this argument before Judge Go or in any of their moving papers. (See R&R at 29 ("The State Defendants do not argue that plaintiff's constitutional rights were not clearly established.").) An argument that is raised for the first time in an objection to an R&R is generally not considered by the district court. Libbey v. Vill. of Atlantic Beach, 982 F. Supp. 2d 185, 199 (E.D.N.Y. 2013) (citing Kennedy v. Adamo, No. 02-CV-1776 (ENV) (RML), 2006 WL 3704784, at *1 (E.D.N.Y. Sept. 1, 2006)). The court discerns no basis for exempting State Defendants, who are represented by competent counsel, from this rule. Accordingly, this objection is OVERRULED.

### 5. Liability of Defendant Barbarotta

State Defendants also object to Judge Go's R&R as it pertains to Defendant Ann Marie Barbarotta in particular. (State Defs.' Obj. at 18-19.) Specifically, State Defendants argue that Barbarotta has committed no wrongful act for which she can be personally liable for damages. (Id. at 18.) Yet State Defendants also failed to raise this argument before Judge Go or in any of their moving papers. See Libbey, 982 F. Supp. 2d at 199 (E.D.N.Y. 2013) ("[T]he Court ordinarily will not consider 'arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the magistrate judge in the first instance." (quoting Kennedy, 2006 WL 3704784, at *1)). Thus, for the same reason the court declines to consider State Defendants' objection that none of the constitutional rights alleged to have been violated

were clearly established, the court will not consider their argument regarding Defendant Barbarotta's personal liability at this point in the litigation. See supra Part III.A.4. Accordingly, this objection is OVERRULED.

## B. Plaintiff's Objections

Turning next to Plaintiff's objections to the R&R, the court first notes that Plaintiff consents to the dismissal of: (a) all claims pursuant to the Fifth, Sixth,[21] Eighth, and Thirteenth Amendments; (b) his claim under the Equal Protection Clause of the Fourteenth Amendment; and (c) all claims against all Defendants in their official capacities. (Pl.'s Obj. at 7.) The court has reviewed for clear error those portions of Judge Go's R&R to which Plaintiff does not object, and discerns none. Therefore, those portions of Judge Go's R&R are ADOPTED IN FULL.

### 1. Objection with Respect to City Defendants

Plaintiff objects, however, to Judge Go's recommendation that the court dismiss all claims against City Defendants in their personal capacities. Judge Go found that City Defendants were entitled to quasi-judicial immunity from suit for damages "for conducting court-ordered examinations and producing corresponding reports concerning a defendant's

---

[21] In Plaintiff's affidavit in amendment to his objections, which the court construes as a reply to City Defendants' response to his objections, Plaintiff "rescinds" consent to dismissal of his Sixth Amendment claim, arguing that he was "unlawfully deprived of the right to pro se representation in the section 730 proceeding by the State Defendants." (Pl.'s Am. Obj. at 1.) Even if the court were to consider this objection, raised for the first time in a reply to a response to an objection—which the court might be inclined to do, given Plaintiff's pro se status— Plaintiff's objection simply reiterates his original arguments, and thus entitles him only to clear error review of this portion of Judge Go's R&R. (See, e.g., Pl.'s Oct. 29, 2013, Ltr. (Dkt. 77) at 2.) The court discerns no clear error in Judge Go's recommendation that Plaintiff's Sixth Amendment claim be dismissed. (See R&R at 27.) Moreover, if the court were to engage in de novo review, the court would adopt Judge Go's recommendation: Even if State Defendants were somehow liable for any conduct that took place in connection with Plaintiff's section 730 proceedings (and the court fails to comprehend how they could be), the Sixth Amendment does not apply in connection with those proceedings. See Katzman v. Khan, 67 F. Supp. 2d 103, 111-12 (E.D.N.Y. 1999) (noting the Sixth Amendment expressly protects only those accused in a "criminal prosecution," and holding that mental examinations and involuntary commitment proceedings are not accusatory and therefore not criminal in nature). Therefore, Plaintiff's objection to Judge Go's recommended disposition of Plaintiff's Sixth Amendment claim is OVERRULED.

competency to stand trial."[22]  (R&R at 12 (citing <u>Inesti v. Hicks</u>, No. 11-CV-2596 (PAC) (AJP), 2012 WL 2362626, at *16 (S.D.N.Y. June 22, 2012) (report and recommendation) (collecting cases), <u>adopted</u>, 2012 WL 3822224, at *11 (S.D.N.Y. Sept. 4, 2012)); <u>id.</u> at 13.) Plaintiff argues that City Defendants "Schneider and Sarayia were not specifically ordered to [examine] plaintiff pursuant to CPL § 730.20(3), thereby depriving them [of] absolute immunity." (Pl.'s Obj. at 6; <u>see also</u> Best Reply at 2 ("[N]o evidence has been submitted to show or establish that they were specifically ordered by a court of law to perform the acts complained of.").)

As City Defendants point out, however, not only has Plaintiff raised this argument for the first time in his objection, but his claim that City Defendants were not specifically ordered to examine him contradicts the allegations he made in his Amended Complaint. (Rosinus Decl. ¶ 14.) There, Plaintiff alleged "Defendants Schneider and Saraiya, <u>acting in concert</u> with Defendants Schecter and Rooney"—whom Plaintiff alleges were the assigned criminal court judge and assigned Assistant District Attorney, respectively—"fabricated conclusions regarding [Plaintiff's] mental state." (Am. Compl. at 5 (emphasis added).)  More importantly, Plaintiff's objection is contradicted by the very documents he incorporates into his Amended Complaint. Specifically, the Examination Reports indicate that each City Defendant swore that he conducted an examination of Plaintiff's mental state "having been designated by the Commissioner of Health and Mental Hygiene Services of the City of New York, pursuant to an order signed by the Hon. Judge SCHECTOR [sic]." (Am. Compl. app. at 1, 6.)  While the court must accept as true all well pleaded, nonconclusory allegations of fact in Plaintiff's Amended Complaint, the court

---

[22] Plaintiff does not specifically object to Judge Go's determination that in general, doctors performing psychiatric or psychological evaluations pursuant to court orders are entitled to immunity for preparing their reports.  Reviewing Judge Go's determination for clear error, the court discerns none.

does not credit conclusory allegations that are contradicted by the documents he attaches to the Amended Complaint. See, e.g., Koulkina v. City of N.Y., 559 F. Supp. 2d 300, 329 (S.D.N.Y. 2008). Thus, even if Plaintiff were entitled to de novo review, the court determines that Plaintiff's claims are insufficient to defeat City Defendant's motion to dismiss. Accordingly, this objection is OVERRULED.[23]

## 2. Objection with Respect to State Defendants

Plaintiff explains that with the exception of his Fifth, Sixth, Eighth, and Thirteenth Amendment claims, his claim under the Equal Protection Clause, and his claim against all Defendants in their official capacities, he "object[s] to the recommendation that the State defendants'[] motion to dismiss be granted in part." (Pl.'s Obj. at 7.) However, it was only with respect to those claims that Judge Go recommended that State Defendants' motion be granted in part.[24] Consequently, as State Defendants themselves point out (State Defs.' Resp. at 5), none of Plaintiff's objections regarding State Defendants address adverse recommendations in Judge Go's R&R.[25] Moreover, the court has already engaged in de novo review of the claims Plaintiff has not consented to dismiss, and has determined that his substantive due process claim, his

---

[23] Plaintiff further explains, in his objection, that he "seeks compensation . . . for the time spent on Rikers Island prior to being transferred to Creedmoor[]." (Pl.'s Obj. at 5.) Perhaps Plaintiff does so in response to Judge Go's observation that Plaintiff had not brought a claim relating to his detention at Rikers. (See R&R at 3 n.3.) Regardless, Plaintiff's objection on these grounds is OVERRULED. Just as plaintiffs—and even pro se plaintiffs—may not raise new claims in opposition to a motion to dismiss, Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 390 n.19 (S.D.N.Y. 2013), Plaintiff may not amend his Amended Complaint through his objection to the R&R. See Kennedy, 2006 WL 3704784, at *1 (noting pro se plaintiff may not raise arguments not presented to the magistrate judge in the first instance). For the same reason, Plaintiff's objections: that he was fraudulently represented by an attorney in New York County Criminal Court, and thus seeks to name this attorney as an additional defendant in this litigation (Pl.'s Obj. at 2); and that City Defendants committed medical malpractice (Best Reply at 2); are also OVERRULED.

[24] The only exception involves Plaintiff's claim with respect to Defendant Hogan, which Plaintiff himself withdrew at oral argument. See supra note 2.

[25] This includes Plaintiff's objections related to Justice Schecter (see Pl.'s Obj. at 1-2, 5-6). As the court mentioned above, on January 10, 2013, the court dismissed with prejudice Plaintiff's claims against Justice Schecter and ADA Rooney as a result of their absolute immunity from suit. (See Jan. 10, 2013, Mem. & Order at 4-5.) Because the R&R, accordingly, did not address these claims, Plaintiff's objection is OVERRULED.

procedural due process claim based on allegedly fraudulent physician certifications, and his Fourth Amendment claim all survive State Defendants' motion to dismiss.[26] See supra Part III.A. Thus, to the extent any aspect of Plaintiff's filings could be construed as objecting to Judge Go's R&R, those objections are OVERRULED.

### 3. Other Objections

The court construes Plaintiff's multiple filings as raising two additional objections. First, Plaintiff points out that he "seeks judgment declaring CPL § 730.30(3) unconstitutional, as it does not mandate a hearing when each psychiatric examiner is of the opinion that the defendant is an incapasitated [sic] person."[27] (Best Reply at 2.) However, not only have all claims against City Defendants been dismissed on grounds of absolute immunity, but the Second Circuit has also explicitly rejected a due process challenge to the civil commitment scheme established by section 730, at least where the State initiates civil commitment proceedings within 72 hours of confining the patient. See Charles W. v. Maul, 214 F.3d 350, 359 (2d Cir. 2000). Thus, even if Plaintiff is entitled to de novo review of this objection, raised for the first time in an unauthorized reply to City Defendants' response to his objections, his objection is OVERRULED.[28]

---

[26] Plaintiff also argues in response to State Defendants' objections that he was not afforded a hearing within five days—presumably, within five days of his request—pursuant to New York Mental Hygiene Law § 9.31(c). (See Best Resp. at 2.) Not only does Plaintiff fail to allege the date he requested a hearing, or the date the court received notice of that hearing, but Plaintiff also may not raise new arguments in response to objections to Judge Go's R&R. See supra note 23.

[27] Specifically, section 730.30(3) provides that "[w]hen the examination reports submitted to the court show that each psychiatric examiner is of the opinion that the defendant is an incapacitated person, the court may, on its own motion, conduct a hearing to determine the issue of capacity and it must conduct such a hearing upon motion therefore by the defendant or by the district attorney." N.Y. Crim. Proc. Law § 730.30(3) (emphasis added). In Plaintiff's case, Justice Jackson noted no hearing was requested. (See Velez Ltr., Ex. C at 3.)

[28] Plaintiff also argues in response to State Defendants' objections that he was not afforded a predeprivation hearing within 72 hours of his transfer to Creedmoor. (Best Resp. at 2.) This is not what the law requires, cf. Charles W., 214 F.3d at 359-60, nor may Plaintiff raise new arguments in response to objections to Judge Go's R&R. See supra note 23.

Second, Plaintiff objects to Judge Go's consideration of Defendants' motions to dismiss prior to ruling on Plaintiff's outstanding motion to amend his Amended Complaint, which was filed before Defendants' motions to dismiss, and which this court had also referred to Judge Go for a report and recommendation. (See Best Resp. at 3; Best Reply at 3; Pl.'s Am. Obj. at 2; see also May 21, 2013, Order (Dkt. 51) at 2 (further referring for R&R "Defendants' motion to dismiss, if necessary given Plaintiff's anticipated motion to amend").) As the court noted above, Judge Go indicated that Plaintiff's motion to amend would be addressed in a separate order. (R&R at 2 n.2.) Plaintiff argues that this was improper because his proposed Third Amended Complaint presents "additional material facts" not alleged in his Amended Complaint.[29] Notwithstanding the intuitive appeal of Plaintiff's argument, his objection is without merit.

The only claims being dismissed to which Plaintiff does not consent are Plaintiff's claims against City Defendants in their personal capacities, and Plaintiff's Fourteenth Amendment procedural due process claim based on State Defendants' failure to provide a predeprivation hearing. The court dismisses with prejudice Plaintiff's claims against City Defendants in their personal capacities. While courts generally avoid dismissing pro se claims "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000), courts may deny plaintiffs the opportunity to amend "when amendment would be futile," Fulton v. Goord, 591 F.3d 37, 45 (2d Cir. 2009). In this case, where Plaintiff's claims against City Defendants are barred by quasi-judicial immunity, leave to amend would be futile. See, e.g., Bliven v. Hunt, 579 F.3d 204, 209 (2d Cir. 2009) ("[E]ven allegations of bad faith or malice

---

[29] In referring Plaintiff's motion to amend his Amended Complaint, the court noted that Plaintiff was not entitled to amend his pleading as a matter of right because he had failed to do so within 21 days after service of Defendants' motion to dismiss under Rule 12(b). (See May 21, 2013, Order at 1-2.)

cannot overcome judicial immunity."). However, the court dismisses his predeprivation hearing claim <u>without</u> prejudice; accordingly, Plaintiff is not precluded from re-alleging this claim in any further amended complaint that the court grants him leave to file.

Therefore, because Plaintiff's claims are not prejudiced by the fact that Judge Go issued her R&R regarding Defendants' motions to dismiss before considering Plaintiff's motion for leave to amend his Amended Complaint, Plaintiff's second additional objection is OVERRULED.

## IV.    CONCLUSION

Accordingly, for the reasons set forth above:

- State Defendants' objections are OVERRULED IN PART and SUSTAINED IN PART; Plaintiff's objections are OVERRULED;

- The R&R is therefore ADOPTED IN PART and REJECTED IN PART;

- All claims against City Defendants are DISMISSED WITH PREJUDICE; City Defendants' motion is GRANTED in its entirety;

- All claims against Defendant Michael Hogan are DISMISSED WITHOUT PREJUDICE;

- State Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART:

  - o  All claims against State Defendants in their official capacities are DISMISSED WITH PREJUDICE;

  - o  All claims against State Defendants in their personal capacities pursuant to the Fifth, Sixth, Eighth, and Thirteenth Amendments, as well as Plaintiff's claim under the Equal Protection Clause of the Fourteenth Amendment, are DISMISSED WITH PREJUDICE;

  - o  Plaintiff's claim against State Defendants in their personal capacities based on the denial of his right to a predeprivation hearing under the Fourteenth Amendment is DISMISSED WITHOUT PREJUDICE; and

o  Plaintiff's claims against State Defendants in their personal capacities based on the denial of his Fourteenth Amendment procedural due process right to physician certifications under New York Mental Hyg. Law § 9.27, denial of his Fourteenth Amendment substantive due process rights, as well as denial of his Fourth Amendment rights, all remain.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
September 18, 2015

NICHOLAS G. GARAUFIS
United States District Judge